## Prince Realty Corp. v.
## Zoning Board of Adjustment

*Israel Stiefel*, for appellant.

*Gordon Cavanaugh*, for zoning board of adjustment.

LEVINTHAL, J., June 20, 1957.—This is an appeal from an order of the zoning board of adjustment refusing Prince Realty Corporation's application for a certificate authorizing it to use certain vacant ground, located at the northwest corner of Diamond and Van Pelt Streets, Philadelphia, as a site for a new and modern automobile service station. The use is permitted in the district, which is zoned "A" commercial, only if a zoning board of adjustment certificate is obtained: Code of General Ordinances of the City of Philadelphia, sec. 14-303(2) (*f*) (.2). The standards to be observed by the board in the granting or refusing of such a certificate are the lessening of congestion in the streets, the promotion of health and the general welfare, the providing of adequate light, air and transportation, the prevention of the overcrowding of land and similar requirements: sec. 14-1802(3) (*c*), Code of General Ordinances.

Following notice to interested parties, the board held a public hearing, during the course of which it accepted on behalf of the applicant, a descriptive sketch of the neighborhood, certain photographs of the site and apparently unsworn statements of one of applicant's officers, which were given in response to questions put to him by his counsel and the board. Applicant's attorney and an attorney who had entered his appearance for certain alleged protestants also made

unsworn statements to the board. The board accepted from the latter attorney petitions opposing the proposed use, purportedly signed by numerous residents of the neighborhood, none of whom appeared in person. The board, however, expressly noted that the proceeding was not a "popularity contest" and that no weight would be attached to the petitions. Three days after the public hearing, the board, in an order which did not specify the grounds for its action, refused to issue the certificate.

Lacking a statement of the board's reasons, applicant appealed to this court, contending that the certificate should have been issued because: (1) The area in question is predominantly commercial, having many establishments of a cognate nature; (2) the proposed service station would be advantageous to travelers on Diamond Street and particularly to persons residing in the immediate vicinity; (3) the board's action was arbitrary and capricious.

Approximately four months following the appeal, the board, in support of its decision, issued findings of fact and conclusions of law and certified its record of the proceeding to this court. In its findings, the board adopted the report of its inspector, who visited the neighborhood, which described nearby structures and uses. It also found that the general area in question is "mixed residential and commercial", that the Raymond Rosen Homes, a "newly erected and constructed housing development containing 1,122 dwelling units" is in close proximity to the site in question, that children attending the public schools in the neighborhood "must pass the proposed gasoline service station at least 4 times a day", that the use "would create an additional traffic hazard on Diamond Street, which is already a very heavily traffixed (sic) street", and that protestants appeared and presented a petition signed by at least 100 nearby residents, opposing the application.

Upon these findings, the board concluded that the proposed use would be contrary to public interest in that an "increase in traffic conditions" would be "offensive" to neighbors and the use would create a "hazardous condition" for school children, that the proposed use "would not fit into the orderly development of this mixed residential and commercial district", and that the "health, morals, safety and general welfare" of persons residing in the immediate neighborhood, would be adversely affected by the granting of a certificate.

The issues raised by the appeal were clear. Appellant contended that there was no testimony whatever to support findings that the proposed use would adversely affect traffic conditions or create a hazardous condition for school children. Appellant also attacked, as arbitrary, capricious and incorrect, the board's conclusions that the proposed use would not fit into the orderly development of the district and that it would adversely affect the health and general welfare of persons living in the immediate neighborhood.

The court held a hearing on these issues at which time three witnesses testified for appellant and were cross-examined by an assistant city solicitor, representing the board. Additionally, the judge who heard the appeal visited the site in question and personally inspected the immediate neighborhood.

With respect to the supposed "increase in traffic conditions" and the creation of a "hazardous condition" for school children, one witness for appellant testified that Diamond Street is a main traffic artery which is already heavily traveled, that the site in question was selected because a traffic count disclosed a sufficient existing sales potential to warrant a station and because there are hundreds of homes in the general area, that the nearest existing gasoline station (at the southwest corner of the intersection of 22nd

and Diamond Streets, directly across the street from a corner of the Raymond Rosen housing development), which is one block away, is an inadequate facility because it has a very narrow "strip", causing some automobiles to remain on the sidewalk, and that the proposed station, being modern in every respect, will have ample area to accommodate automobiles without using the sidewalks.

Another witness testified that he visited the site frequently for a period of several weeks preceding the hearing, making it a point to see how many school children passed the spot. He testified that there are two schools in the area, each approximately a block and a half from the proposed site, that, while some few children pass the site, most come from the west side of 22nd Street, so that relatively few have to pass the site in question. A third witness testified that, except for a few shabby buildings, the lot is vacant, that it is used as a dumping ground for debris, that it is presently an "eyesore" and that some neighbors have objected and asked that something be done to erect buildings on this ground. In this connection, it was brought out that Van Pelt Street near this vacant lot is a dark street and that lighting from the proposed station, which will be focused only on the property itself, will improve safety by dispelling the darkness at this corner.

With respect to the character of the neighborhood, both parties agree that it is mixed commercial and residential, and there is little, if any, dispute concerning the location and nature of the various existing structures and uses.

The hearing judge's view of the neighborhood confirmed the accuracy of the general description of the area, namely, that east of the site the area is predominantly residential, whereas on the west side of Van Pelt Street it is almost entirely commercial. It is

obvious that the site in question must be used for some commercial purpose. One viewing the location cannot help but conclude that a modern, well-run service station on this site would be less objectionable than a bath house, billiard parlor, bowling alley, pool hall or cafe, which, for example, could be erected there without a certificate from the board: Code of General Ordinances, sec. 14-303(1).

We are compelled to conclude that the board committed an abuse of discretion in refusing, for the reasons stated in its findings and conclusions, to issue the certificate. Even without the evidence before us, which indicates that service stations follow traffic, rather than vice versa, we would be inclined to view with suspicion an assumption that service stations at ordinary traffic intersections, where no unusual cross-traffic is created, increase congestion in the streets, or otherwise adversely affect traffic or pedestrian safety. See Cohen v. Abington Township Zoning Board of Adjustment, 43 D. & C. 362 (C. P. Montgomery County, 1941). It would seem to be a matter of common knowledge that cars parking or stopping to discharge or receive passengers going to and from retail stores are more likely to create traffic congestion than establishments which have parking facilities for vehicles. The finding respecting the number of school children who would be required to pass the station is utterly unsupported by evidence, being based solely upon unsworn statements of counsel, which were doubtless intended merely as argument, and not as accurate testimony based upon specific observation, such as was given in the hearing before us.

Since we are aware of the difficulties encountered by the board in hearing, deciding and explaining its action with respect to the large number of cases constantly coming before it, and since we also are reluctant to disturb discretionary decisions of any special-

ized administrative board, we would be inclined simply to ignore these errors of the board and sustain its action on the ground that the health and welfare of nearby residents would adversely be affected by the proposed use in other ways. The record, however, demonstrates that this criterion also was incorrectly applied, since there is no evidence whatever to support such a conclusion. Our own independent finding is that the proposed use will, if anything, tend to relieve the congestion of traffic on Diamond Street at this corner, and that it will improve the appearance and cleanliness of the lot and render the corner safer for pedestrians, particularly at night, thereby promoting, somewhat, the health and welfare of the nearby residents. That a gasoline station may perhaps be aesthetically repugnant or offensive to the sensibilities of some residents or to some members of the board, is, of course, irrelevant as a standard in applying zoning restrictions.

In view of the foregoing, it is our duty to reverse the order of the board and direct the issuance of the certificate. See Food Corporation v. Zoning Board of Adjustment, 384 Pa. 288 (1958), where, as in the present case, the board erroneously applied relevant criteria and refused a certificate upon findings derived solely from unsworn statements of counsel, upon objections which were without reasonable foundation and upon an "arbitrary, capricious and incorrect" conclusion that the proposed use would be more offensive or detrimental to the neighborhood than other commercial uses which could be maintained as a matter of right.

At the hearing before this court, counsel for the board raised a new objection to the proposed use, one which the board either failed to consider or rejected as untenable. He argues in the alternative that the entrances and exits of the proposed service station on

Van Pelt Street would begin at the curbline and hence would be within the prohibited distance of 50 feet from the church property at the northeast corner of Van Pelt and Diamond Streets, or that, if the entrances and exits be regarded as at the building line, they would still be within the prohibited distance. The prohibition referred to is set forth as follows in section 14-303 (2) (*f*) of the code:

"*Use Restrictions—With Certificate* (2) The following uses will be permitted . . . only if a Zoning Board of Adjustment certificate . . . is obtained . . .

"(f) Garages:

"(.1) A private garage for pleasure or commercial vehicles;

"(.2) A public or commercial garage or repair shop, gas and oil service stations, provided, that no entrance or exit shall be located within 50 feet of property used for a school, church, hospital or public library;

"(.3) A parking garage for pleasure or commercial vehicles. . . ."

The parties stipulated that the cartway of Van Pelt Street is 26 feet wide and that the pavements on both sides are 12 feet wide, so that the church on the northeast corner of Diamond and Van Pelt Streets is exactly 50 feet from the building line of the lot on which appellant seeks to erect the gasoline service station.

It is important to note that the limitation in question does not apply to open air parking lots (sec. 14-1402), or to private garages, or parking garages, as defined in sections 14-102 (12) (*a*) and 14-102 (12) (*d*) of the code. It is applicable only to public and commercial garages, as defined in the code, secs. 14-102 (12) (*c*), 14-102 (12) (*b*), repair shops and gas and oil service stations. It is also important to note that in other sections of the ordinance spaces on foot-walks which vehicles traverse in passing to and from a street are called "driveways" (sec. 14-1401 (5) ) or "driveway

704

approaches" (sec. 14-1403(4), rather than "entrances" or "exits".

We think it is clear from a consideration of the wording of the foregoing provisions of the code, that "entrance" and "exit" must be given their commonly understood meaning, and that consequently they must be held to refer to openings to enclosed places, i.e., doors or gates. The fact that the limitation is not applicable to all types of uses involving the passage of motor vehicles on and off property clarifies the intention of city council. A comparison of the prohibited uses with the parking uses which were not made subject to the limitation indicates a purpose of singling out structures from which noise and, perhaps, obnoxious fumes might reasonably be expected to emanate, rather than properties to and from which numerous vehicles might be expected to pass. It seems clear to us that the driveways of service stations are no more obnoxious than the driveways of open air parking lots or parking garages. If council had intended to mark the limit at the curbline, or at the building line, or even at the gasoline pumps themselves, language could have been employed which, reasonably construed, would have accomplished that objective. We think council's intention to mark the limit at openings to the station structure is clear.

It therefore is unnecessary to dwell at length upon the alternative contention that if the building line of the service station marks the entrance, then "within" means "at or within", rather than "inside the compass or limits of", so that an entrance exactly 50 feet from a church property is within the prohibition. It may be observed, however, that if council had the building line in mind, rather than the curbline, no apparent reason existed for prohibiting entrances or exits on such lines within 50 feet of church property and permitting other parts of the building line to lie within 50 feet. Also,

notwithstanding Perrin's Appeal, 305 Pa. 42 (1931), it is, we think, most unusual to construe "within" as meaning "at or within", rather than "inside the limits or compass of". See e.g., Vine v. Board of Adjustment of Ridgewood, 136 N. J. L. 416, 56 A. 2d 122 (Sup. Ct., N. J., 1947); Sacks v. Legg, 219 Ill. App. 144, 148 (1920). Even in Perrin's Appeal, supra, the Supreme Court indicated that a contrary construction of the word "within" was in accordance with the "spirit and intent" of the particular ordinance there construed. It did not indicate that such construction was the invariable, usual or even ordinary construction of the word "within". That case is distinguishable by reason of its special circumstances, and its ruling should not be extended.

### Order

The decision and order of the zoning board of adjustment refusing appellant the certificate requested is reversed, and the board is directed to issue such a certificate to appellant.